Filed 1/25/23  Quarker v. City of Culver City CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| TREASURE QUARKER et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF CULVER CITY, <br><br> Defendant and Respondent. | B314109 <br><br> (Los Angeles County Super. Ct. No. BC668362) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark H. Epstein, Judge.  Reversed.

Singleton Schreiber, Benjamin I. Siminou; Bish & Cutting and Stacey R. Cutting for Plaintiffs and Appellants.

McCune & Harber, Kenton E. Moore and Tiffany Schneider for Defendant and Respondent.

————————————————

Treasure Quarker, her children, and nephew sued Aiman Ahmed Ibrahim, who, while inebriated, drove into Treasure Quarker as she stood behind her parked vehicle. Quarker's children and nephew were inside the vehicle. Plaintiffs also sued the City of Culver City, alleging a single cause of action for dangerous condition of public property. The trial court granted summary judgment in favor of Culver City finding no dangerous condition of public property and no causation. Accordingly, the trial court concluded that as a matter of law, plaintiffs could not prove a cause of action for dangerous condition of public property.

We reverse the judgment. The evidence, when interpreted in the light most favorable to plaintiffs, supports the inference that a dangerous condition of public property existed and was a cause of the collision. Culver City created a lane taper to guide moving vehicles away from parked vehicles. The taper was inconsistent with guidelines designed to promote safety and with Culver City's own design. A reasonable trier of fact could conclude that the failure to follow these safety guidelines resulted in the taper failing to divert traffic from the parked car lane, and thus created a dangerous condition of public property. Although it is undisputed that Ibrahim was inebriated when he collided with Quarker, his culpability does not necessarily negate the possibility that the dangerous condition of public property also caused the collision.

## BACKGROUND

### 1. *Plaintiffs sue the City for dangerous condition of public property*

Treasure Quarker, Kamare Brazie, Ariyon Quarker, Amir Quarker, Arion Quarker (Treasure Quarker's children and

nephew) (collectively plaintiffs) sued the City of Culver City (sometimes referred to as the City) and Aiman Ahmed Ibrahim. Plaintiffs alleged that on June 18, 2016 at 1:02 a.m., Treasure Quarker's vehicle "was lawfully parked at a parking meter at the north curb of Washington Boulevard . . . ." According to the complaint, "Washington Boulevard is a designated east/west roadway having two traffic lanes in each direction, a middle turn lane, and interspersed metered parking located along the north curb of Washington Boulevard's westbound lane."

Plaintiffs alleged Treasure Quarker had secured the children inside the vehicle and was standing at the rear of her vehicle when Ibrahim "drove into the rear of Plaintiff's vehicle without braking [the collision]." "Plaintiff Treasure Quarker's legs were crushed between the two vehicles." Treasure Quarker required the immediate amputation of her left leg and suffered other fractures. The children, who were inside the vehicle at the time of the collision, allegedly suffered unidentified injuries.

The only cause of action plaintiffs alleged against the City is for a dangerous condition of public property. Plaintiffs alleged "the subject location constituted a dangerous condition [of] public property that created a reasonably foreseeable risk of the type of injury hereinafter alleged when the property was used with due care in a manner that was reasonably foreseeable in that, among other dangerous and defective conditions, the number 2 lane of westbound Washington Boulevard at the subject location on which Defendant Ibrahim was traveling veers left and abruptly changes into interspersed metered parking spots without any clear demarcation, warning, striping, signing, or signaling, to notify drivers of the metered parking on the north curb of westbound Washington Boulevard."

**2. *The parties agree that at the time of the collision, Ibrahim was intoxicated and could not recall the collision or events preceding it***

According to the parties' separate statements, the following facts are undisputed: In January 2018, Ibrahim pleaded no contest to violating Vehicle Code section 23153, subdivision (b), driving with a blood alcohol level of .16 percent. Ibrahim did not remember "driving at any point before the crash, nor what lane he was driving in." Ibrahim "did not remember the route he took leading up to the crash, and when he awoke believed that plaintiffs crashed into *his* vehicle." "Ibrahim . . . admitted that he did not remember anything between 10:30 p.m. and 1:30 a.m. on the night of the accident." "Ibrahim had no recollection of driving on Washington Boulevard or how his vehicle struck Ms. Quarker and her vehicle." "Ibrahim did not recall driving towards plaintiffs' vehicle at any point before the accident."

**3. *The City moves for summary judgment***

In its motion for summary judgment, the City argued: "[T]here were no similar accidents on Washington Boulevard in the nine-years preceding the subject accident, and a lack of prior accidents proves Culver City did not have notice of the supposed dangerous condition. Additionally, the lack of prior similar accidents and the area where the accident occurred was flat and straight combin[ing] to prove the roadway was not in a dangerous condition of public property. Further, the area where the accident occurred was part of an approved plan or design, immunizing the City from liability under Government Code [section] 830.6. Next, any claimed defect was minor, trivial, or insignificant . . . . Finally, defendant Ibrahim solely caused the

4

accident due to his intoxicated driving." (Boldface & italics omitted.)

In support of their motion, the City attached the declaration of John Fisher, a civil and traffic engineer, who worked part-time as a consultant for Culver City. According to Fisher, the Manual on Uniform Traffic Control Devices (MUTCD), is the "authoritative source for all streets and roadways open to public travel." Fisher reviewed the City's collision history and found seven collisions in a nine-year period preceding the subject Collison. None involved "a westbound vehicle colliding with a parked vehicle." Based on the collision history, Fisher opined that the area was "reasonably safe[ ] relative to the risk of motor vehicle conflicts with on-street parked vehicles."

According to Fisher, "[T]he existing tapered striping is shorter than that prescribed in the California MUTCD. The existing taper shifts the striping five feet to the south. It starts approximately 92 feet west of the Robertson Boulevard/Higuera Street intersection and ends approximately 166 feet west of the intersection, a tapered length of 74 feet. . . . [T]he actual tapered length is 28 feet short of the guideline . . . and the taper should have ended 194 feet westerly of the intersection, not at 166 feet westerly of the intersection. Although the taper is somewhat short, parking is prohibited with red curb along the north side within the entire 166-foot existing zone and the 194-foot MUTCD-compliant zone. Thus, there is no safety consequence to parked vehicles since there is no parking in the existing 166-foot zone nor in the 194-foot MUTCD-compliant zone." Fisher opined that the short taper did not "play a role in the subject incident"

5

because the collision occurred 249 feet west of the taper and 221 feet west of the MUTCD compliant taper.

Mate Gaspar, an engineering service manager employed by the City, stated that in December 2002, the City Council approved plans for resurfacing Washington Boulevard and in 2004 accepted the project. Gasper reported the parking spots were removed after the collision to make room for a bus stop and that the removal "had nothing to do with the subject accident."

The City also included the declaration of former police officer Jason Davis, who had investigated the collision. He stated that the collision occurred 415 feet from the intersection of Robertson. The trial court excluded Davis's traffic collision report, and on appeal, the City does not challenge the propriety of that exclusion.[1]

In support of its motion for summary judgment, the City attached part of Ibrahim's deposition and responses to discovery, and a transcript of his criminal sentencing at which he took "full responsibility" for the collision and was sentenced to four years and four months of jail time for driving under the influence of alcohol. Also in the context of the criminal proceedings, Ibrahim admitted, "I was very much under the influence." Ibrahim also admitted he did not recall driving his vehicle at the time of the collision. He stated: "I have no recollection from 10:30 to 1:30.

---

[1] If the proponent of excluded evidence does not challenge the trial court's exclusion of the evidence, any challenge to that ruling is waived. (*Lopez v. Baca* (2002) 98 Cal.App.4th 1008, 1014–1015; see also *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 66 [in reviewing summary judgment, court does not consider evidence to which objections were made and sustained].)

1:30 I woke up, in my car and the accident had already happened." Ibrahim reiterated that he did "not remember any of the roadway markings on the night of the incident."

The City also attached the Culver City Police Department's arrest report. According to the arrest report, after the collision, Ibrahim had a breath alcohol content of .16 percent.

### 4. *Plaintiffs oppose summary judgment*

In support of plaintiffs' opposition to the City's summary judgment motion, plaintiffs attached deposition testimony from Fisher, the City's designated person most knowledgeable (and the person who offered a declaration in support of the City's motion). In his deposition, Fisher testified the MUTCD "is an important reference and resource for the application of traffic control devices." Fisher also testified that one purpose of the MUTCD was to promote safety. "The presence of the tapered striping is a visual identification for the driver to adjust his lateral distance from the curb." "If the length of tapered striping were longer, that would allow a longer time to transition further from the north curb line." "The provisions of the MUTCD are designed to allow drivers sufficient time to make proper decisions." Fisher testified that the lane taper was 74 feet long and "[t]he length of taper was 28 feet short of the guideline. But . . . the guideline is not a mandate." Fisher explained, "Drivers are expected to be guided by the lane line or the center line . . . . The lane line would be to the left of the vehicle, and the driver should be watching how it changes throughout the route."

Plaintiffs proffered the expert declarations of William Neuman and Brad Avrit in support of their opposition. Neuman described himself as a licensed civil engineer, professor of engineering, and involved in the field of "traffic engineering" for

7

more than 50 years. Avrit described himself as a licensed civil engineer, who has analyzed more than 12,000 accident cases and has routinely qualified as an expert in human factors. His resume lists his membership in several professional societies, including the American Society of Safety Professionals, the California Association of Accident Reconstruction Specialists, and the Human Factors and Ergonomics Society. Both Neuman and Avrit opined that a driver unaware of the shortened taper will not adjust to avoid the parking lane. Neuman also opined: "While not required Culver City should have taken steps to protect the public from this dangerous condition by limiting parking to daylight hours, and/or using signage to warn drivers of the parked cars ahead, installing rumble strips, providing reflectors on the taper, or painting a solid line on the right side of the taper roadway to alert drivers to the taper."

5. ***The trial court grants summary judgment***

At the hearing on the City's motion for summary judgment, the City's counsel acknowledged that in redesigning Washington Boulevard to allow for the parking spaces where Quarker parked her vehicle, Culver City did not follow the MUTCD or its own plans. Culver City's counsel described the MUTCD as "the Bible" of "road design in the State of California."

Following the hearing, the trial court entered judgment in favor of Culver City because plaintiffs failed to establish a dangerous condition of public property and because plaintiffs failed to show causation.

The trial court found the City had established its initial burden in moving for summary judgment by showing that the accident site was over 200 feet from the taper and that no similar accidents occurred in the past nine years. The court concluded

8

plaintiffs had not raised a triable issue of material fact as to the existence of a dangerous condition because the taper length was "a guideline, albeit a widely respected one." "[T]he failure to follow the taper-length guideline is somewhat troubling. But that is not enough. . . . The flaw in plaintiffs' logic is that the dangerous condition had to exist at the accident site to be relevant, not at some other location."

The trial court further found that "the accident here occurred well beyond what the taper would have been had the taper complied fully with the MUTCD guidelines." The trial court also found that Ibrahim "was inebriated when he was driving and did not remember seeing any roadway markings, or taking any evasive actions, and did not recall driving toward plaintiff's vehicle; plaintiffs failed to demonstrate that the condition of the roadway otherwise contributed to or caused plaintiffs' injuries such that Mr. Ibrahim was not the sole cause of the accident . . . ."

## DISCUSSION

" 'The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute.' [Citation.] '[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law.' [Citation.] A defendant can meet this burden by 'present[ing] evidence which, if uncontradicted, would constitute a preponderance of evidence that an essential element of the plaintiff's case cannot be established.' [Citation.] 'Once the [defendant] has met that burden, the burden shifts to the

[plaintiff] to show that a triable issue of one or more material facts exists as to the cause of action . . . .' [Citations.] A triable issue of material fact exists when 'the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' [Citation.]" (*Webster v. Claremont Yoga* (2018) 26 Cal.App.5th 284, 287–288.)

A public entity is " 'liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably forseeable risk of the kind of injury which was incurred, and [that] . . . [t]he public entity had actual or constructive notice of the dangerous condition . . . a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.' " (*Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139, 146 (*Bonanno*).)

Government Code section 830 defines a dangerous condition as " 'a condition of property that creates a substantial . . . risk of injury when such property or adjacent property is used with due care' in a 'reasonably foreseeable' manner." (*Bonanno*, *supra*, 30 Cal.4th at p. 147.) The existence of a dangerous condition generally is a question of fact but may be a question of law if "reasonable minds can come to only one conclusion." (*Id.* at p. 148.)

In addition to showing the existence of a dangerous condition, a plaintiff must show, inter alia, that "the dangerous condition proximately caused his or her injury." (*Bonanno*, *supra*, 30 Cal.4th at pp. 154–155.) A public entity may be liable

10

for a dangerous condition of public property that " 'caused the injury plaintiffs suffered in an accident, but did not cause the third party conduct that led to the accident.' " (*Cordova v. City of Los Angeles* (2015) 61 Cal.4th 1099, 1104; see *ibid.* [summary judgment reversed because wrongful death plaintiffs did not have to show the alleged dangerous condition, a magnolia tree in a city median strip, caused the third party-conduct, a motorist's sideswiping the car driven by decedents which car then hit the tree].)

On appeal, the parties dispute the existence of a triable issue of fact as to the existence of a dangerous condition of public property and causation. The parties also dispute the admissibility of evidence in plaintiffs' expert declarations. As we shall explain, once the admissible evidence is considered, plaintiffs raised triable issues of material fact both as to the existence of a dangerous condition of public property and causation.

## A. The Trial Court Abused its Discretion In Excluding Portions of Plaintiffs' Experts' Declarations

On appeal, the parties dispute whether the trial court abused its discretion in excluding parts of Neuman's and Avrit's declarations. (See *Lowery v. Kindred Healthcare Operating, Inc.* (2020) 49 Cal.App.5th 119, 124 [appellate court reviews exclusion of expert testimony for abuse of discretion].) We begin with additional background and then consider the parties' arguments.

To recapitulate from our Background, defense expert, Fisher, a civil and traffic engineer, opined: "The difference in tapers shown in the guideline versus the actual striping did not play a role in the subject incident, in my opinion, as the location was far downstream, or west, of the zone of tapered striping. . . .

11

[C]ompared with the end of MUTCD-compliant tapered striping, the subject incident was approximately 221 feet . . . , westerly of that point . . . ." According to Fisher, although the taper is somewhat short, parking is prohibited with red curb along the north side within the entire 166-foot existing zone and the 194-foot MUTCD-compliant zone. Thus, there is no safety consequence to parked vehicles since there is no parking in the existing 166-foot zone nor in the 194-foot MUTCD-compliant zone."

William Neuman, plaintiffs' expert, counter-opined, "The problem created by the shortened notice is when a driver misses the need to taper, then that driver will be unaware of the taper and will continue west much in the same position in the westbound number 2 lane beyond the taper and not move south. . . . Once past it, there are no further informational inputs to the driver unless he sees a car which may trigger a response." Brad Avrit, plaintiffs' other expert, held the same opinion. Both experts analogized missing the taper to missing a "Do Not Enter" sign.

The City objected to Neuman's and Avrit's opinions on the basis that they were conclusory and not within Neuman and Avrit's expertise because both were "unqualified to opine on human factors." In its order granting summary judgment, the trial court essentially agreed with the City: "Essentially, Culver City argues that they [Neuman and Avrit] do not lay an adequate foundation for their opinions. For example, both Mr. Neuman and Mr. Avrit attest as to reaction speed and depth perception at night. They also attest to what draws a driver's attention while driving and whether missing a taper is analogous to missing a one-way street sign. But neither Mr. Neuman nor Mr. Avrit have

12

established that, as traffic engineers, they can opine on human behavior, nor have they established that they have been trained to analyze such issues."

An expert must provide a " 'reasonable basis for the particular opinion offered' " and cannot rely on " 'speculation or conjecture.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770.)  Trial courts, however, must "be cautious in excluding expert testimony.  The trial court's gatekeeping role does not involve choosing between competing expert opinions." (*Id.* at p. 772.)

In *Caloroso v. Hathaway* (2004) 122 Cal.App.4th 922, 928–929, a case the City cites, the appellate court affirmed the grant of summary judgment based on the absence of a triable issue of fact as to a dangerous condition of a sidewalk after the plaintiff fell on a crack in the sidewalk that was not greater than half an inch high.  The appellate court agreed with the trial court that as a matter of law, a half inch crack in a sidewalk was too trivial to form a dangerous condition.  (*Id.* at p. 927.)  Second, and more relevant to the issues here, the appellate court held that that plaintiff could not avoid that conclusion by relying on its expert's opinion about noncompliance with the building code.  The expert "failed to indicate that these codes and standards have been accepted as the proper standard in California for safe sidewalks.  Moreover, there is no indication regarding whether such codes apply to existing walkways as opposed to new construction." (*Id.* at p. 928.)  Thus, the trial court did not abuse its discretion in excluding that expert opinion in that case.

Here, in contrast to *Caloroso*, it was undisputed that the City failed to comply with the MUTCD, and that its taper was shorter than the state standard (and the distance required even

13

in the City's own design plan).  In other words, *Caloroso*'s finding that a court did not abuse its discretion in excluding an expert's opinion that the failure to follow building codes made a condition dangerous was based on the absence of evidence that the building codes set the applicable standard for safe sidewalks.  Here, the City's expert acknowledged that the MUTCD is the "authoritative source for all streets and roadways open to public travel."

Assuming, as the City argues, that only an expert on human factors could assess the consequence of the shortened taper, Avrit claimed such expertise.  As noted in our Background, it was undisputed that Avrit had "extensive technical and practical experience in conducting safety investigations based on his investigation of 12,000 accident cases over 28 years, including "hundreds of similar cases."  He also "personally qualified as an expert in human factors on numerous occasions in Courts within California and Nevada and throughout the United States."  On appeal, the City offers no challenge to Avrit's claimed expertise and no support for its assertion that Avrit's opinion lacked foundation because he is not an expert on human factors.  The trial court thus abused its discretion in excluding Avrit's opinion on the basis that he lacked the requisite expertise for his opinions.

More fundamentally, the trial court essentially chose between competing expert declarations.  At the summary judgment stage, courts must construe the opposing party's evidence liberally.  (*Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 189.)  "In light of the rule of liberal construction, a reasoned explanation required in an expert declaration filed in opposition to a summary judgment motion need not be as detailed or extensive as that required in expert

14

testimony presented in support of a summary judgment motion or at trial." (*Ibid.*; see also *Michaels v. Greenberg Traurig, LLP* (2021) 62 Cal.App.5th 512, 524 ["a reasoned explanation required in an expert declaration filed in opposition to a summary judgment motion need not be as detailed or extensive as that required in expert testimony presented in support of a summary judgment motion or at trial"].)

Although expert opinion lacking in foundation or speculative is inadmissible (*Lynn v. Tatitlek Support Services, Inc.* (2017) 8 Cal.App.5th 1096, 1115), both Neuman and Avrit had extensive experience and both had observed the available "informational inputs" to cue a driver to avoid the parking lane before they opined the taper was the only marking directing traffic away from parked vehicles. (See *Cole v. Town of Los Gatos* (2012) 205 Cal.App.4th 749, 761–763 (*Cole*) [expert declaration based in part on expert's observation of area provided basis for expert's opinion].) The trial court abused its discretion in excluding plaintiffs' experts' opinion that a driver who misses the taper would not otherwise be alerted to the lane-shift.[2] (See *Cole*, at p. 764 [holding that at summary judgment stage, trial court erred in excluding plaintiff's expert declarations that directly rebutted defendant's expert declarations].)

---

[2] Although the parties dispute the admissibility of other portions of Neuman's and Avrit's declarations, we do not rely on those portions and therefore do not decide whether the court erred in excluding those portions.

15

**B.    The City Does Not Show as a Matter of Law That No Dangerous Condition of Public Property Existed**

The City argues:  (1) "The complete absence of prior similar accidents proves there is no substantial risk of injury and hence no dangerous condition"; and (2) "The accident occurred some 200 feet beyond the ending of either the existing lane taper or the recommended lane taper.  During that last 200 feet the two westbound lanes run parallel to the curb lane on Washington Boulevard.  Accordingly, any deviation from the MUTCD did not render the Subject Location *per se* dangerous."

The latter argument is based on an incorrect premise.  The issue is not whether the location was "*per se* dangerous," but whether plaintiffs raised a triable issue of material fact supporting the inference that a dangerous condition of public property existed, i.e., a condition creating a substantial risk of injury when used with due care in a reasonably forseeable manner.  (*Bonanno*, *supra*, 30 Cal.4th at p. 147.)

There was admissible evidence supporting the inference that a dangerous condition of public property existed.  The City failed to comply with safety guidelines when it accepted a taper that did not comply with MUTCD guidelines or the City's own plans.  Fisher testified in his deposition:  "The California MUTCD contains standards, guidance, options, and support statements regarding the application of traffic control devices."  The MUTCD "refers to promoting highway safety and efficiency."  "With regard to safety, the . . . length of the lane tapering is a consideration . . . ."  "Traffic safety is always a consideration when applying traffic controls in the MUTCD."  "The provisions of the MUTCD are designed to allow drivers sufficient time to make proper decisions."  "The presence of the tapered striping is

16

a visual identification for the driver to adjust his lateral distance from the curb." "We have the tapered striping to identify for the road user to transition over to a point further from the north curb line." "If the length of tapered striping were longer, that would allow a longer time to transition further from the north curb line." "The purpose of the tapered striping was to provide a lane that would be further from the north curb prior to the zone of where parking was to be accommodated." Both Neuman and Avrit averred that a driver who misses the taper will continue driving in the parking lane, which the City does not dispute is a substantial (not a trivial) danger.

The fact that the accident occurred over 200 feet beyond the taper does not demonstrate the absence of a dangerous condition of public property as a matter of law. According to Fisher, the taper was designed to move cars away from the parking spaces in advance of those spaces. According to plaintiffs' experts, the taper did not achieve that purpose, which supports the inference that the substandard taper created a risk for vehicles in the parking lane, notwithstanding that the accident occurred over 200 feet beyond the taper.

On appeal, the City argues: "The complete absence of prior similar accidents proves there is no substantial risk of injury and hence no dangerous condition." Although not dispositive on the issue of the existence of a dangerous condition, the absence of prior similar accidents is a relevant consideration. (*Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1071.) The absence of similar accidents, however, is insufficient to show *as a matter of* law, no dangerous condition of public property existed. (*Lane v. City of Sacramento* (2010) 183 Cal.App.4th 1337, 1346 [absence of similar accidents is

17

relevant but is not dispositive of whether a condition is dangerous]; but see *Thimon v. City of Newark* (2020) 44 Cal.App.5th 745, 763 [remote risk where evidence showed lack of similar collisions in 10 years proceeding accident].) In sum, because the evidence could support the conclusion that a dangerous condition of public property existed, the trial court erred in concluding as a matter of law that it did not.[3]

## C. The City Does Not Show It Is Entitled to Judgment as a Matter of Law on Causation

The City argues: "[N]o physical characteristic of the property exposes users to increased danger from third-party negligence or criminality." (Boldface & some capitalization omitted.) For purposes of this appeal only, we assume the City satisfied its initial burden on summary judgment and conclude that plaintiffs raised a triable issue of material fact as to causation.

A third party's conduct may combine with a dangerous condition to cause injury. "[I]f a condition of public property 'creates a substantial risk of injury even when the property is used with due care' [citation], a public entity 'gains no immunity from liability simply because, in a particular case, the dangerous condition of its property combines with a third party's negligent conduct to inflict injury.' [Citation.]" (*Cordova, supra,* 61 Cal.4th

---

[3] Because we conclude that plaintiffs raised a triable material fact concerning the existence of a dangerous condition based on the length of the taper, we need not consider the parties' arguments concerning whether the public property was dangerous because the City did not use raised reflectors or thermoplastic striping.

18

at p. 1105.)  Our high court rejected the view that "a public entity cannot be held liable for a property defect that 'combines with a third party's negligent conduct to inflict injury' [citation], unless the plaintiff can show that the defect caused the third party negligence." (*Id.* at pp. 1106–1107.)  The high court held that a plaintiff was not required to show "that the allegedly dangerous condition also caused the third party conduct that precipitated the accident." (*Id.* at p. 1106.)  The City's reliance on *Cerna v. City of Oakland* (2008) 161 Cal.App.4th 1340, 1348 for the principle that "[t]here must be a defect in the physical condition of the property and that defect must have some causal relationship to the third party conduct that injures the plaintiff" therefore is misplaced.

In *Cole, supra,* 205 Cal.App.4th at p. 769, the appellate court explained that a public entity may be responsible for a dangerous condition to public property when it, along with an inebriated driver, caused injury.  In *Cole,* a plaintiff was injured as she loaded a bicycle into the rear of her vehicle. (*Id.* at p. 754.)  A driver, who had consumed alcohol, left the road and collided with plaintiff. (*Ibid.*)  Plaintiff "theorized that [the defendant driver] had left the road in an attempt to bypass" stopped cars, which were waiting for another driver to make a left-hand turn. (*Id.* at pp. 754–755.)  Plaintiff's theory was that the configuration of the road "and the adjacent gravel area created a danger to users of the latter in that eastbound drivers on [the road] were often induced to leave the road [as the driver who collided with plaintiff did] and enter the graveled area, where they posed an obvious hazard to persons who had parked there (as plaintiff did), and particularly those standing near the rear of a vehicle parked diagonally, as was the custom." (*Id.* at p. 759.)  Plaintiff's traffic

19

expert opined that "various deficiencies in the configuration of the road and graveled area [played] a causal role in the accident." (*Id*. at p. 756.)

The appellate court reversed summary judgment in favor of the defendant town because although the evidence supported the conclusion that the driver veered off the road in a "drunken stupor" (*Cole*, *supra*, 205 Cal.App.4th at p. 778), it also supported the conclusion that the driver veered off the road to avoid the slow traffic (*id*. at pp. 777–778). The appellate court held "a jury could reasonably find a substantial causal relation between the dangerous condition posited by plaintiff and the injuries suffered by her." (*Id*. at p. 778.)

Turning to this case, the trial court focused on Ibrahim's lack of recall and the City incorrectly asserts that Ibrahim "black[ed] out" as a result of drinking. The City cites only to its motion, which is not evidence. Although in the trial court, the City cited to Ibrahim's deposition testimony, that testimony shows only a lack of recall, not that Ibrahim "black[ed] out" from drinking alcohol. Ibrahim's lack of recall after the collision does not foreclose the inference that he collided with Treasure Quarker's vehicle because he missed the too-short taper and no other cue informed him that he was driving in a parking lane.

The City next asserts that Treasure Quarker "was parked more than 200 feet west of the area of where the taper should have ended had the City complied with the MUTCD." The City assertion is not followed by any legal analysis. To the extent the City is arguing that it has demonstrated as a matter of law, the dangerous condition of public property did not cause the collision because the collision occurred west of the taper, the argument is unpersuasive. As we have explained, the purpose of the taper

20

was to move vehicles away from the parking lane to avoid hitting parked cars.  If the taper was ineffective in its purpose, it could create a dangerous condition for any vehicle parked in the adjacent parking lane, including Treasure Quarker's vehicle.  Of course, this will be a matter for the jury to consider, and we express no opinion on the outcome other than to reject the trial court's conclusion that Ibrahim's inebriation caused the accident to the exclusion of any potential liability on the City's part.

Based on the evidence in support and in opposition to summary judgment, a reasonable jury could conclude that Ibrahim missed the taper and received no other cue to move out of the parking lane.  Neuman's and Avrit's admissible opinions support the inference that a driver, such as Ibrahim who misses the taper, will drive into the parking lane, just as Ibrahim did.  A reasonable jury also could conclude that Ibrahim veered into the parking lane in a drunken stupor.  This existence of multiple reasonable inferences precludes granting  summary judgment. (*Cole*, *supra*, 205 Cal.App.4th at p. 756 [to obtain summary judgment party must show that the evidence "raises no material issue that a trier of fact could resolve in favor of the party opposing the motion"].)  Because plaintiffs raised triable issues of material fact as to the existence of a dangerous condition of public property and as to causation, and because the City offers no other ground for affirming the judgment, the trial court erred in granting summary judgment.

21

## DISPOSITION

The judgment is reversed.  Plaintiffs and appellants are entitled to their costs on appeal.

NOT TO BE PUBLISHED.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

CHANEY, J.